UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Case No. 10 CR 821-2 |
| | ) | |
| Daniel J. Sullivan, | ) | Hon. Steven C. Seeger |
| | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Daniel Sullivan is incarcerated at FCI Forrest City, where he is serving a fourteen-year sentence for wire fraud. In April 2020, after serving a little more than two-thirds of his sentence, Sullivan filed a motion for compassionate release. The Court denied that motion, finding that Sullivan had failed to exhaust his administrative remedies.

The next day, Sullivan filed a renewed motion for compassionate release. He supplemented the record by submitting additional correspondence with the Bureau of Prisons about compassionate release. *See* Renewed Mtn., Exs. A, B (Dckt. No. 501). The renewed motion is currently before the Court.

The government did not respond to Sullivan's renewed motion. But in response to the original motion for compassionate release, the government did address the request on the merits, in addition to addressing the issue of exhaustion (before he supplemented the record, that is). The government argued that Sullivan's medical conditions, in combination with the § 3553(a) sentencing factors, did not create "extraordinary and compelling" reasons for early release. *See generally* Resp., at 15–21 (Dckt. No. 489).

In light of Sullivan's supplemental submission, the Court concludes that he satisfied the exhaustion requirement. He was pro se when he made his request to the warden and pursued an

appeal, so the Court will construe the record generously in his favor. *See United States v. Ginsberg*, 2020 WL 2494643, at *2 (N.D. Ill. 2020). But after considering the medical evidence, and after taking into account the § 3553(a) factors, the Court concludes that Sullivan has not provided "extraordinary and compelling" reasons for shortening his sentence. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The renewed motion is therefore denied.

## Background

Sullivan has served a little more than 96 months of a 168-month sentence for wire fraud. *See* 10/6/20 Order, at 1–2 (Dckt. No. 500). That sentence stems from a scam that Sullivan perpetrated on Chicago homeowners. He convinced people to hire him and pay for home remodeling services that he never performed. The Seventh Circuit affirmed his sentence in 2014, providing a detailed description of Sullivan's long-running fraud. *See United States v. Sullivan*, 765 F.3d 712 (7th Cir. 2014).

"By promising homeowners that they could remodel their homes at a discount, the appellants duped numerous people into refinancing their homes and paying the loan proceeds directly to one of the appellants' companies. Once they had the money, the appellants left the job sites unfinished and the homeowners' finances in disrepair." *Id.* at 714.

Sullivan took advantage of some of the most vulnerable people in society. And he did so by design. "Daniel Sullivan told telemarketer Martin Kelliher to look for 'elderly, ignorant homeowners,' and John Sullivan [his brother] added that '[t]he more ignorant, the better. Also, the older, the better.'" *Id.*

Sullivan and his brother "selectively targeted their victims," and "targeted elderly and unsophisticated people for their refinancing scheme." *Id.* at 717. Consider, by way of example,

Harold Ray, a 59-year-old retiree who suffered a stroke and lives on Social Security benefits. *Id.* Sullivan took his money. *Id.*

The victims put their trust in Sullivan, and he exploited that trust. "From 2002 to 2006, the appellants collected over $1.2 million from over forty homeowners who were victims of the scheme." *Id.* At sentencing, the District Court ultimately calculated the losses at more than $400,000 but less than $1 million. *Id.* The District Court also found that Sullivan's fraud involved: (1) vulnerable victims; (2) a violation of a prior court order; (3) sophisticated means; (4) mass-marketing to 10 to 49 victims; and (5) leadership or organization of the scheme. The Seventh Circuit affirmed.

Sullivan began serving his sentence in 2012. *See* Sullivan Computation Sheet (Dckt. No. 494, at 27–30 of 30). He filed a motion for compassionate release (which he called a "Motion to Release to Home Confinement Pursuant to § 3582 and the CARES Act of 2020") on April 29, 2020. *See* Mtn. (Dckt. No. 478). After this Court denied the motion for lack of exhaustion, Sullivan buttressed the record and filed a renewed motion on October 7, 2020. *See* 10/6/20 Order (Dckt. No. 500); Mtn. (Dckt. No. 501).

Meanwhile, vaccinations at the Bureau of Prisons are fortunately underway. So far, the BOP has administered 52,109 doses to staff and inmates. *See* Federal Bureau of Prisons, *COVID-19 Vaccine Implementation*, www.bop.gov/coronavirus/ (last visited Feb. 22, 2021). That figure includes vaccinations at Forrest City, where Sullivan resides. The BOP has vaccinated 175 staff members, and 123 inmates, at that facility. *Id.* More vaccinations are on the way. To date, 1,108 inmates at Forrest City (including both the low-security and the medium-security facilities) have contracted the virus, and two inmates have passed away. *See*

Federal Bureau of Prisons, *COVID-19 Cases*, www.bop.gov/coronavirus/ (last visited Feb. 22, 2021).

## Analysis

Congress established a "default rule that the district court 'may not modify a term of imprisonment once it has been imposed.'" *United States v. Sanford*, 986 F.3d 779, 781 (7th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). But the First Step Act carved out a few "limited exceptions." *Id.* Perhaps the most prominent exception is the compassionate release provision, which empowers (but does not require) district courts to shorten a sentence based on "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i).

A defendant must clear two hurdles. First, the inmate must satisfy the exhaustion requirement. Second, the inmate must give reasons for release that are extraordinary and compelling, after the district court takes into account the factors of section 3553(a).

**I.     Exhaustion**

Before coming to the courthouse, an inmate must submit a request for compassionate release to the Bureau of Prisons. The statutory text uses mandatory language about the need for exhaustion. A district court "*may not*" modify a sentence based on a defendant's motion until "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See* 18 U.S.C. § 3582(c)(1) (emphasis added); *see also Sanford*, 986 F.3d at 782.

A prisoner cannot ask the Bureau of Prisons for compassionate release on one ground, and then ask a district court for compassionate release on some other ground. Instead, the inmate must "present the same or similar ground for compassionate release in a request to the Bureau as

4

in a motion to the court," because "any contrary approach would undermine the purpose of exhaustion." *United States v. Williams*, 2021 WL 486885, at *2 (7th Cir. 2021).

Exhaustion is an affirmative defense – it is not jurisdictional. *See United States v. Gunn*, 980 F.3d 1178, 1179 (7th Cir. 2020). So the government "will lose the benefit of the defense if it fails to properly invoke it." *See Sanford*, 986 F.3d at 782. But if a defendant fails to exhaust, and the government properly raises the issue, the court must deny the request for compassionate release. Exhaustion is a "mandatory claims-processing rule and therefore *must* be enforced when properly invoked." *Id.* (emphasis in original).

Sullivan has filed two motions for compassionate release. The Court denied the first one because Sullivan failed to show that he satisfied the exhaustion requirement. *See* 10/6/20 Order, at 9 (Dckt. No. 500); *cf. United States v. Williams*, 829 F. App'x. 138, 140 (7th Cir. 2020) ("The district court correctly denied compassionate release for Williams based on his failure to present proof that he had satisfied § 3582(c)(1)(A)'s exhaustion requirement.").

In support of his first motion, Sullivan did not file a copy of a request to the Bureau of Prisons for compassionate release. Instead, in his reply brief, Sullivan attached a memo from the warden dated May 5, 2020. And even then, the memo addressed a request for home confinement, not compassionate release. *See* Reply in Support of Mtn., at Ex. A (Dckt. No. 494, at 23 of 30). The subject line of the memo read as follows: "Denied for Home Confinement." *Id.* The body of the memo cemented the point: "You requested Home Confinement based on concerns of COVID-19. After careful consideration, your request is denied." *Id.*

Compassionate release and home confinement are different remedies under different statutes. And the Court has power to grant one but not the other. A federal court has no power to order home confinement, so a motion to compel home confinement is a dead end. *See United*

*States v. Saunders*, 2021 WL 420317, at *2 (7th Cir. 2021) ("The Bureau . . . has plenary control over inmates' placement. . . . A district court may only recommend a new placement, it may not order it."); *Williams*, 829 F. App'x. at 139.

This Court denied his first motion for lack of exhaustion because Sullivan failed to show that he asked the BOP for compassionate release. *See* 10/6/20 Order (Dckt. No. 500). The next day, Sullivan filed a renewed motion. *See* 10/7/20 Mtn. (Dckt. No. 501). Sullivan supplemented the record and provided the back story, based on documents that he did not file the first time around.

The new documents show that Sullivan blended together compassionate release and home confinement in his submissions to the Bureau of Prisons. But he did raise the issue of compassionate release – by name – in later submissions. And he cited the right statute, too.

On June 19, 2020, one month after receiving the warden's memo, Sullivan submitted a handwritten request for an administrative remedy. *See* Request for Administrative Remedy (Dckt. No. 501, at 28 of 36). He expressly referred to compassionate release: "I am appealing the warden's decision denying me home confinement through compassionate release." *Id.* He reported that he had "recovered from COVID-19," but he remained concerned for his safety in light of his family's medical history. *Id.*

A few weeks later, on July 7, 2020, Sullivan submitted to the BOP an attempt to resolve his grievance informally, before filing a complaint. *See* 7/7/20 Documentation of Informal Resolution Attempt (Dckt. No. 501, at 29 of 36). Once again, Sullivan referred to compassionate release. And he cited the compassionate release statute, too. "I sought compassionate release under 18 USC 3582(c)." *Id.* He added that he "sent the warden my compassionate release request more than 5 weeks ago." *Id.*

On July 14, 2020, the Administrative Remedy Coordinator denied his request. *See* Rejection Notice – Administrative Remedy (Dckt. No. 501, at 27 of 36). But the denial was not on the merits. The Coordinator denied the request because Sullivan did not submit the request through his counselor. *Id.* Importantly, the Coordinator did not view the appeal as a request for home confinement. Instead, the subject line read as follows: "REDUCTION-IN-SENTENCE REQUEST." *Id.* So, the Coordinator apparently viewed the appeal as involving a request for a reduction in sentence – that is, a request for compassionate release.

The following day, Sullivan submitted a new request to resolve the grievance informally. *See* 7/15/20 Documentation of Informal Resolution Attempt (Dckt. No. 501, at 26 of 36). Once again, he referred to compassionate release, repeating much of the language from his request on July 7. "I sought compassionate release under '18 USC' 3582(c) through the Warden . . . . I sought compassionate release regarding this matter more than (5) wks ago." *Id.*

And that's where the record – if not the story – ends. Sullivan's submission on July 15, like his submission on July 7, lacked a signature from his counselor. *Id.* It is unclear whether Sullivan continued to pursue any administrative remedies, and if so, what happened.

In light of the new material, the Court will generously interpret Sullivan's original request as a request for compassionate release. The original request is not in the record, and it is not entirely clear how Sullivan phrased or characterized his request. But what matters is the substance, not the terminology. *See United States v. Ginsberg*, 2020 WL 2494643, at *2 (N.D. Ill. 2020) ("Nothing in the statute, governing caselaw, or common sense requires a *pro se* prisoner to cite chapter and verse in order to satisfy a statutory requirement of this sort.").

The Court cannot be certain what the original request said. But the Court draws an inference based on Sullivan's later submissions. After denial of his request, Sullivan continued

7

to press the issue and characterized his request as a request for compassionate release. The fact that Sullivan purported to appeal the "warden's decision denying me home confinement through compassionate release" is some indication that the original request covered compassionate release. *See* Request for Administrative Remedy (Dckt. No. 501, at 28 of 36).

That inference is consistent with the response from the Bureau of Prisons. The BOP viewed his request as an attempt to obtain a reduction in sentence, the term that the Bureau uses for compassionate release. *See* Rejection Notice – Administrative Remedy (Dckt. No. 501, at 27 of 36). The Bureau did not deny his appeal because he was raising the issue of compassionate release for the first time.

Taken together, both Sullivan and the BOP understood that he was seeking compassionate release. That's enough to support an inference that Sullivan requested compassionate release in his original submission. The request may not be in the record, but the post-request correspondence suggests that Sullivan asked to shorten his sentence under the statute.

If Sullivan requested compassionate release, the next question is whether enough time elapsed to allow him to move for compassionate release in federal court. The statute allows an inmate to pursue compassionate relief "after" (1) he has fully exhausted all administrative rights to appeal, or (2) 30 days from the receipt of the request by the warden, "whichever is earlier." *See* 18 U.S.C. § 3582(c)(1)(A). The record remains a bit hazy. It is unclear when, exactly, Sullivan made his original request. But the warden denied it on May 5, 2020, so Sullivan must have submitted it before then. And months later, in July 2020, Sullivan was continuing to press the issue within the Bureau. So the original request percolated inside the Bureau for more than 30 days.

Even if the original request did not count (because it is not in the record), the later submissions did raise the issue of compassionate release expressly. Sullivan requested compassionate release in his follow-up submissions to the Bureau of Prisons on July 7, 2020 and July 15, 2020. *See* 7/7/20 Documentation of Informal Resolution Attempt (Dckt. No. 501, at 29 of 36); 7/15/20 Documentation of Informal Resolution Attempt (Dckt. No. 501, at 26 of 36). He filed the renewed motion for compassionate release in this Court in October 2020, three months later. *See* 10/7/20 Mtn. (Dckt. No. 501). That's more than 30 days. So, Sullivan is eligible to seek relief in this forum, and the Court will address the merits of his renewed motion.

The government did not file a response to Sullivan's renewed motion for compassionate release. Exhaustion is an affirmative defense, and the government must raise it "at every opportunity." *See United State v. Brown*, 2021 WL 406473 (7th Cir. 2021); *see also Williams*, 829 F. App'x. at 140 ("Waiver cannot apply here because the government timely objected to Williams's failure to exhaust at every opportunity."). The government had an opportunity to object to the new collection of material, but said nothing, so any exhaustion argument is waived.

## II.     The Merits

A district court "may" reduce a sentence based on a defendant's motion "after" the defendant has satisfied the exhaustion requirement. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The statutory text sets a high bar. A court may shorten a sentence "after considering the factors set forth in section 3553(a)," but only "if it finds" that "extraordinary and compelling reasons warrant such a reduction." *Id.* "The statute itself sets the standard: only 'extraordinary and compelling reasons' justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii) [*i.e.,* senior inmates]." *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

The statute also contemplates a finding that a reduction is "consistent with applicable policy statements issued by the Sentencing Commission." *See* 18 U.S.C. § 3582(c)(1)(A)(i). But those policy statements are not "applicable" when the defendant (as opposed to the Bureau of Prisons) moves for compassionate release. *See Gunn*, 980 F.3d at 1180; *United States v. Saunders*, 2021 WL 420317, at *2 (7th Cir. 2021).

A defendant's serious medical condition, standing alone, does not compel a district court to grant compassionate release. The court must weigh the medical evidence and sentencing factors together to determine if a defendant meets the high statutory bar for release. "Because of the importance of the § 3553(a) factors, courts are not compelled to release every prisoner with extraordinary and compelling health concerns." *See Saunders*, 2021 WL 420317, at *2.

Courts have "broad discretion" to consider requests for release. *Id.* "The task of the court [i]s to weigh the competing considerations." *United States v. Burnley*, 834 F. App'x. 270, 272 (7th Cir. 2021). "District courts must operate under the statutory criteria – 'extraordinary and compelling reasons' – subject to deferential appellate review." *See Gunn*, 980 F.3d at 1181.

Sullivan argues that there are "extraordinary and compelling reasons" here given his health conditions and the danger that the COVID-19 pandemic poses to him because of those conditions. *See* Renewed Mtn., at 4–9 (Dckt. No. 501). Sullivan focuses on his obesity, asthma, and age, all of which place him at greater risk if he contracts the virus. *Id.*

On balance, the medical evidence does not weigh very heavily in favor of compassionate release. Sullivan points to his weight, but he seems modestly overweight. Sullivan has a BMI of approximately 35, in the middle range for obesity, but below the cutoff for "severe obesity," which is a BMI of 40. *See* Centers for Disease Control, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-

10

adults.html (last visited February 22, 2021); *see also United States v. Tranter*, 471 F. Supp. 3d 861, 864–65 (N.D. Ind. 2020) (explaining that "BMI alone" was not compelling medical evidence and that there were "no current medical issues resulting from [defendant's] obesity, indicating to the Court that it has little adverse effect on his overall health"); *United States v. Villasenor*, 2020 WL 7129368, at *6 (N.D. Ill. 2020) ("But several courts have denied compassionate release motions filed by relatively young defendants . . . with one or two COVID-19 risk factors, particularly in cases involving a border line obesity diagnosis.").

Sullivan also has asthma, and the CDC indicates that moderate-to-severe asthma can increase a person's risk from COVID-19. *Id.* Sullivan does use an inhaler, but overall, the asthma does not seem to be particularly serious. *See* Renewed Mtn., at 6 (Dckt. No. 501). In its original response, the government disputed the notion that Sullivan's asthma was "moderate-to-severe." *See* Resp., at 17–18 (Dckt. No. 489). Sullivan's reply does not address the severity of his asthma. Instead, he provides general information about how COVID-19 affects people with asthma. *See* Reply, at 7 (Dckt. No. 494). The information was general, not specific to Sullivan.

Courts in this Circuit have declined to find extraordinary and compelling circumstances based on asthma that is well treated. *See, e.g., United States v. Forrest*, 2020 WL 5110473, at *2 (N.D. Ill. 2020) (finding that a defendant's "asthma does not present an extraordinary and compelling reason for compassionate release" when it "appear[ed] well controlled") (collecting cases); *United States v. Porter*, 2020 WL 2509105, at *3 (C.D. Ill. 2020) (finding no extraordinary and compelling reasons for release when defendant was able to "manage" his asthma). Courts elsewhere have reached the same conclusion. *See, e.g., United States v. Rodriguez*, 454 F. Supp. 3d 224, 228 (S.D.N.Y. 2020) ("All he has done is to note that he has asthma, he is in prison, and there is a COVID-19 outbreak nationwide. That is not enough.");

11

*United States v. Ogarro*, 2020 WL 5913312, at *2 (S.D.N.Y. 2020) (holding that "it is dubious" that having asthma during a pandemic is an extraordinary and compelling reason for release).

Finally, Sullivan is middle aged. He is 54 years old. *See* Renewed Mtn., at 8 (Dckt. No. 501). It is true that risk from COVID-19 increases with age. *See* Centers for Disease Control, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited February 22, 2021). But Sullivan is on the low end of the 50-64 age category. And, the CDC notes that "[t]he greatest risk for severe illness from COVID-19 is among those aged 85 or older." *Id.*; *see also United States v. Young*, 834 F. App'x. 268, 269 (7th Cir. 2021) (noting that a "middle-aged man" was "not in the highest-risk group").

Overall, Sullivan has provided reasons, but they are less than compelling. He is somewhat overweight. He may have moderate to severe asthma, but it seems well treated through his inhaler. And he is on the young side of the vulnerable age group. The risk, viewed as a whole, does not seem particularly significant.

Sullivan also contracted COVID-19 once already and, thankfully, he recovered. He does not appear to have suffered any significant long-term health impact. And Sullivan has made no showing that he is at an even greater risk if he contracts the virus a second time. If anything, his recovery suggests that the risk of another infection does not create an extraordinary and compelling reason for early release. *See United States v. Bartlett*, 2021 WL 54024, at *2 (N.D. Ill. 2021) ("The fact that Mr. Bartlett contracted and recovered from COVID-19 cuts against granting the relief he requests."); *United States v. Thompson*, 2020 WL 7771141, at *3 (N.D. Ill. 2020) (noting that the defendant "has already been infected with Covid-19" and went "on to recover" when denying a motion for compassionate release); *United States v. Lohmeier*, 2021 WL 365773, at *2 (N.D. Ill. 2021).

The Court also considers Sullivan's request in light of the factors set forth in section 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A). On balance, the Court concludes that the factors weigh against compassionate release. *See Saunders*, 2021 WL 420317, at *2 (holding that, "[b]ecause of the importance of the § 3553(a) factors" courts can deny release even "despite the threat that [a prisoner] faces from COVID-19"). After considering the factors and medical evidence together, the Court finds that the evidence does not support the notion that there are "extraordinary and compelling reasons" for shortening his sentence.

The statutory factors include the "nature and circumstances" of the offense and Sullivan's "history and characteristics." *See generally* 18 U.S.C. § 3553(a). In addition, the Court considers the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *Id.* Also, the Court takes into account the need for deterrence, the need to protect the public, and the need to provide appropriate care for the defendant. *Id.* Other factors weigh in the balance, too, such as the release plan and the amount of time remaining on his sentence.

Many of those factors weigh against release. First and foremost, Sullivan committed a particularly serious financial crime. He encouraged his victims to take home equity loans, and then stole the proceeds. For many people, home equity is their nest egg. It is, for many families, their most important financial asset. Home equity often represents a lifetime of work. It provides critical financial security, too, and long-term *physical* security. Defrauding someone out of their home equity steals their past and threatens their future.

The Court is not finding that the victims in question lost their life savings, or faced a real risk of homelessness because of Sullivan. Instead, the Court is making a simple, inescapable point: stealing a victim's home equity is a serious financial crime.

Stealing home equity is bad enough. But here, Sullivan stole from the old and the vulnerable. Not by accident. By design. *See Sullivan*, 765 F.3d at 714–15.

Sullivan did not merely defraud one or two people. Dozens of homeowners put their trust in Sullivan, and they have losses to show for it. Totaling somewhere between $400,000 and $1,000,000. *Id.* at 715.

Sullivan's fraud was not a fleeting lapse in judgment, either. It was a well-orchestrated plan, concocted with his brother, and implemented by a team of fraudsters over a long period of time. The fraud lasted from 2002 to 2006. *Id.*

Sullivan received a sentence of 168 months. The length of the sentence reflects the fact that Sullivan committed a serious offense that deserves a serious punishment. The significant sentence creates deterrence for other would-be fraudsters, too. It sends a message about what can happen if someone preys upon the weak and the vulnerable.

Sullivan also has a significant amount of time left on his sentence. He began his 168-month sentence on December 18, 2012, roughly 98 months ago. After taking into account his prior credit time of 775 days, he has served about 124 of the 168 months, leaving roughly a quarter of his sentence to go.

The Court acknowledges that some factors weigh in Sullivan's favor. But not heavily. Sullivan is middle aged, so he has a lower risk of recidivism. *See, e.g.*, United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* 24, Fig. 11 (2016) (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf). Sullivan has had only a few disciplinary infractions while incarcerated. *See* Resp., at 20 (Dckt. No. 489).

Viewing the record as a whole, after considering the medical evidence and all of the factors under section 3553(a), the Court concludes that Sullivan has not provided "extraordinary and compelling" reasons for a reduction in sentence. *See* 18 U.S.C. § 3582(c)(1)(A)(i).

## Conclusion

For the foregoing reasons, the Court denies the motion for compassionate release.

Date: February 23, 2021

Steven C. Seeger
United States District Judge