UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 10-cr-821-2 |
| | ) | |
| DANIEL J. SULLIVAN | ) | Hon. Steven C. Seeger |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Daniel Sullivan was convicted of a home remodeling scheme that preyed on vulnerable Chicago homeowners. He served a lengthy prison sentence and was ordered to pay hundreds of thousands of dollars in restitution.

As it turns out, Sullivan lodged roughly $400,000 in a safety deposit box. Years later, the bank discovered the cash when it drilled into the box, after no one paid the lease. That discovery probably surprised the bank. And it caught the attention of the government, too.

The government now seeks to recover the funds, and filed a motion for a turnover order. *See* Govt.'s Renewed Mtn. for Turnover Order, at 1 (Dckt. No. 533). In response, Sullivan contends that the money no longer belongs to him because he gifted it to his children.

For the reasons explained below, the government's motion for a turnover order is hereby granted.

## Background

In 2011, Defendant Daniel Sullivan was convicted of wire fraud, stemming from a home remodeling scam that he perpetrated against Chicago homeowners. *See* Jury Verdict (Dckt. No. 244). The superseding indictment alleged that the conduct took place from 2002 to 2006. *See* Superseding Indictment (Dckt. No. 49).

Judge Castillo sentenced Sullivan to a 168-month prison term. The Court also ordered Sullivan to pay $710,983.33 in restitution. *See* 11/13/12 Order (Dckt. No. 304).

In 2007 – before his conviction and incarceration – Sullivan opened a safety deposit box at the Village Bank and Trust in Arlington Heights, Illinois. *See* Safe Deposit Box Lease Agreement (Dckt. No. 533, at 8 of 57); Def. Sullivan Dep., at 13:7-11 (Dckt. No. 533).

Sullivan applied for the box on his own. *See* Safe Deposit Box Lease Agreement (Dckt. No. 533, at 8 of 57). His signature was the only signature on the application for the lease agreement. *See* Def. Sullivan Dep., at 17:3-5 (Dckt. No. 533). No one else was listed as a

co-applicant or signatory for the safety deposit box lease agreement. *See* Safe Deposit Box Lease Agreement (Dckt. No. 533, at 8–15 of 57).

When Sullivan opened the safety deposit box, he used his driver's license as identification. *Id.* (16 of 57). Sullivan gave the bank his correct date of birth and phone number. *See* Def. Sullivan Dep., at 15:5-9, 16:15-17 (Dckt. No. 533).

But Sullivan didn't give the bank his real Social Security Number. *Id.* at 16:12-14. He didn't give the bank his real address, either. *Id.* at 15:11-23. Sullivan says that he provided the bank with a friend's address, and a false Social Security Number, to prevent his father from knowing about the safety deposit box. *Id.* at 16:3-11.

The bank issued two keys for the box. *See* Safe Deposit Box Lease Agreement (Dckt. No. 533, at 8 of 57). Sullivan kept one key for himself. *See* Def. Sullivan Dep., at 15:5-9, 13:12-15 (Dckt. No. 533). He placed that key on his key ring and carried it every day. *Id.* at 14:9-15.

Sullivan gave the other key to his son, Daniel Sullivan, Jr. ("Danny"). *Id.* at 13:12-15. Danny was 13 years old when he received the key. *See* Danny Sullivan Dep., at 26:12-19 (Dckt. No. 533).

From 2007 until 2010 (when he was arrested), Defendant Sullivan was the only person who accessed the safety deposit box. *See* Def. Sullivan Dep., at 14:3-5 (Dckt. No. 533). Sullivan visited the box between 15 and 20 times to put money inside it. *Id.* at 21:5-10. Before his arrest, Sullivan paid the annual rental fee for the box. *Id.* at 21:11-15.

After Sullivan became incarcerated in 2010, he reminded Danny (again, his son) to pay the rental fee once a year. *Id.* at 25:5-10. Danny made three or four rental payments while his dad was in prison. *See* Danny Sullivan Dep., at 35:6-17 (Dckt. No. 533). But at some point, he forgot to pay. *Id.* at 36:9-14.

While Danny initially received a key, his grandfather (Defendant Sullivan's father) ended up with that key. *See* Def. Sullivan Dep., at 23:4-6 (Dckt. No. 533). Defendant's father also obtained Defendant's key. *Id.* The record does not shed much light on how Sullivan's dad got both keys, but Sullivan testified that his father "stole" them. *Id.* at 26:18-22.

According to Defendant Sullivan, he always intended the money in the box as a gift for his son, Danny, and his daughter, Jessica. None of the Sullivans had documentation that the money in the safety deposit box was a gift. *Cf.* Danny Sullivan Dep., at 9:1-11 (Dckt. No. 533); Def. Sullivan Dep., at 8:22 – 9:7 (Dckt. No. 533); Jessica Sullivan Dep., at 23:13 – 24:9 (Dckt. No. 535).

Defendant Sullivan testified about when Danny and Jessica came to visit him in prison in 2014. Sullivan testified that he told the kids that he would help them access the money after his release, if they did not get it before he returned from prison. *See* Def. Sullivan Dep., at 23:15 – 24:13 (Dckt. No. 533).

At deposition, Danny testified that his father told him that the money in the safety deposit box was intended as a gift to Danny and Jessica. *See* Danny Sullivan Dep., at 45:14-18 (Dckt. No. 533). Danny testified that he knew that the box contained money but did not know the amount. *Id.* at 37:12-18. Danny never accessed the box (or tried to do so). *Id.* at 38:11-12, 39:7-12.

Jessica testified that she did not know about a safety deposit box before her father was released from prison. *See* Jessica Sullivan Dep., at 24:4-23 (Dckt. No. 535). According to Jessica, her father said that she'd be "taken care of" when he came home from prison. *Id.* at 25:9-14. But his statements were "pretty vague." *Id.* Jessica testified that her father did not reference a safety deposit box or a specific amount of money. *Id.* at 25:17-23.

After Danny failed to pay the rental fees for the safety deposit box, the lease expired. *See* Safe Deposit Delinquent Drilling Log (Dckt. No. 533, at 50 of 57). It expired in November 2016 (several years before Sullivan was released from prison). *Id.*

In 2017, the bank drilled into the box. *Id.* It uncovered $401,200 in cash. *Id.* One can only imagine the reaction of the bank when it realized that it had drilled into the box, and hit pay dirt. It must have felt like a miniature, modern-day version of discovering King Tut's tomb.

Danny didn't know about the drilling at the time. He found out about it closer to his father's release from prison in 2021. *See* Danny Sullivan Dep., at 39:14 – 40:10 (Dckt. No. 533). At that point, Danny called the bank. *Id.* A bank employee told him the box "was suspended, something like that." *Id.*

Danny did not follow up with the bank about the suspension right away. *Id.* at 40:7 – 41:8. Instead, he decided to wait until his dad was released from prison. *Id.*

After Sullivan got out of prison, he called the bank and asked about the safety deposit box. *See* Def. Sullivan Dep., at 29:22 – 30:14 (Dckt. No. 533). A few days later, a bank employee called him and informed him about a government hold on the box pending an investigation. *Id.* at 30:3-14. Sullivan responded by calling his attorney. *Id.* at 31:23 – 32:3.

Once the government learned that Village Bank and Trust had a safety deposit box with Sullivan's name on it, containing more than $400,000, it issued a citation to freeze the assets. *See* Citation as to Village Bank (Dckt. No. 508). It then filed a motion for turnover of $400,665 for restitution payments. *See* Govt.'s Renewed Mtn. for Turnover Order (Dckt. No. 515).

Defendant opposed the motion for turnover. *See* Def.'s Resp. to Govt.'s Mtn. for Turnover Order (Dckt. No. 517). He argued that the funds weren't subject to a turnover order because he had given them to his children as a gift. *Id.*

The government requested discovery. *See* 1/31/22 Order (Dckt. No. 526). The Court directed Defendant Sullivan and Danny Sullivan "to produce to the government, on an expedited basis, any documents reflecting the ownership of the funds, and reflecting the control of the

3

safety deposit box in question at Village Bank and Trust." *Id.* The government deposed Sullivan and his children, Danny and Jessica Sullivan.

After discovery, the government filed a renewed motion for a turnover order. *See* Govt.'s Renewed Mtn. for Turnover Order (Dckt. No. 533). Sullivan again opposed the motion, arguing that the funds were turned over to his children more than a decade earlier. *See* Def.'s Resp. to Govt's Renewed Mtn. for Turnover Order (Dckt. No. 534).

This Court issued an order, directing the parties to reveal whether they wanted an evidentiary hearing. *See* 3/24/23 Order (Dckt. No. 540). The parties filed a joint statement, agreeing that no evidentiary hearing was necessary. *See* 4/6/23 Joint Status Report (Dckt. No. 541). The parties asked the Court to resolve the motion based on the record at hand. *Id.*

## Analysis

"[T]he Mandatory Victims Restitution Act . . . permits courts to enforce restitution orders using the same practices and procedures for the enforcement of a 'civil judgment' under federal or state law." *United States v. Lee*, 659 F.3d 619, 620 (7th Cir. 2011) (citing 18 U.S.C. § 3613(a)).

Under section 3613(a), "a judgment imposing a fine may be enforced against all property or rights to property of the person fined." *United States v. Sayyed*, 862 F.3d 615, 618 (7th Cir. 2017) (quoting 18 U.S.C. § 3613(a)). In other words, the government can only order a defendant to turn over funds that belong to him. The government "step[s] into the defendant's shoes" and gets whatever rights the defendant has. *Id.* at 619.

A lien attaches against the defendant's property when judgment is entered against him. "An order for payment of restitution becomes a lien on all property and rights to property of the defendant upon entry of judgment[.]" *United States v. Kollintzas*, 501 F.3d 796, 802 (7th Cir. 2007). The district court entered judgment against Defendant Sullivan on November 13, 2012. *See* 11/13/12 Order (Dckt. No. 304). So, November 13, 2012 is the date of the lien.

The Mandatory Victims Restitution Act is a "procedural mechanism by which the government collects debts," not "a statute that redefines property rights." *United States v. Swenson*, 971 F.3d 977, 984 (9th Cir. 2020). So, courts "look initially to state law" to determine a defendant's property rights. *See United States v. Henricks*, 886 F.3d 618, 625 (7th Cir. 2018). "State law is used only to determine the parties' property rights, and federal law is applied to determine whether the property could be liquidated for restitution payments." *Id.*

Illinois law applies to determine ownership of the safety deposit box.[1] The key question is whether Sullivan made a gift to his children under state law.

---

[1] "In general, the law of the debtor's domicile state defines the property interests to which a judgment lien may attach." *United States v. Berry*, 951 F.3d 632, 637 (5th Cir. 2020); *see also United States v. Mitchell*, 403 U.S. 190, 190 (1971); *United States v. Rodgers*, 461 U.S. 677, 683 (1983). The parties agree that Sullivan is domiciled in Illinois and that Illinois law applies. *Compare* Govt.'s Renewed Mtn.,

4

Under Illinois law, "a gift is a voluntary gratuitous transfer of property from donor to donee where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee." *In re Marriage of Romano*, 968 N.E.2d 115, 135 (Ill. App. Ct. 2012) (cleaned up).

"The three elements needed to prove a gift are donative intent, acceptance, and delivery." *In re Marriage of Link*, 839 N.E.2d 678, 681 (Ill. App. Ct. 2005); *Hall v. Country Cas. Ins. Co.*, 562 N.E.2d 640, 648 (Ill. App. Ct. 1990) ("Intent and delivery are separate elements of proof[.]"). Defendant Sullivan must prove each element by clear and convincing evidence. *See Ball v. Kotter*, 2012 WL 987223, at *13 (N.D. Ill. 2012), *aff'd*, 723 F.3d 813 (7th Cir. 2013).

The government focuses on delivery. *See* Govt.'s Renewed Mtn., at 5 (Dckt. No. 533).

Based on the record as a whole, the Court finds that Sullivan did not satisfy his burden on any of the elements, let alone all of them. The Court finds that the money belonged to Sullivan, not his children. The Court finds that Sullivan didn't give the money away. Instead, he hid it.

First, the Court finds that Sullivan did not have donative intent, meaning an intent to give the money to his children.

For starters, there is no documentation from the period in question that Sullivan contemporaneously intended to give the money away. There is no card, or letter, or note, or email, or text, or anything else in writing suggesting that Sullivan intended to give the money away. There is no tax return showing the payment of a gift tax, either.

Maybe the family wasn't big on "Thank You" notes. Even so, the absence of any contemporaneous record of a gift is telling. Especially a gift of this magnitude.

To be sure, Sullivan testified that he always intended that the money was a gift for his children. But his testimony has more than a little hair on it.

After all, Sullivan was convicted of wire fraud. He is a convicted felon with a history of telling falsehoods. So this Court is more than a little skeptical of taking his word at face value. *See* Fed. R. Evid. 609; *United States v. Johnson*, 2011 WL 809194, at *1 (N.D. Ill. 2011) (opining that a witness's prior fraud conviction weighed heavily in assessing that witness's character for truthfulness).

Sullivan also has a motive to lie. So does his son, Danny. Sullivan wants the money to go to his child. And Danny wants the money to go to Danny. *Cf.* 1 McCormick On Evidence § 39 (8th ed. 2022) ("[C]ourts have long acknowledged that bias, or any acts, relationships, or motives reasonably likely to produce it, may be proved to impeach credibility . . . .").

The behavior was bizarre, too. People don't tend to keep hundreds of thousands of dollars in cash in a safety deposit box. People put money in banks. If Sullivan intended to give

---

at 5 (Dckt. No. 533) (citing Illinois law), *with* Def.'s Resp., at 4 (Dckt. No. 534) (same). So, the Court looks to Illinois law to assess Sullivan's property interests.

the money to his children, and if everything was on the up and up, then the bank was a more likely place to put it.

Putting so much money in a safety deposit box is what you would do if you wanted to hide it. A safety deposit box is off the grid. It's hard to track what's inside. And a safety deposit box is more secure than hiding the cash under the mattress. It's a good hiding spot. It's the above-ground version of burying the funds in the backyard.

The origin of the safety deposit box doesn't inspire confidence, either. Sullivan used a fake Social Security Number to open the box. He used someone else's address, too. That's the type of thing that you would do if you wanted your stash of cash to stay off the grid.

Viewing everything together, nothing supports a finding of donative intent, except the testimony of a fraudster and his self-interested son. No documents support their story. And their story is too sketchy and outlandish to be believed.

Second, the Court finds that the children did not accept the gift. They didn't get their hands on the money. They didn't even know how much was there.

Danny testified that he knew that the safety deposit box contained money. But he didn't know how much. He didn't exercise control over the money, and he didn't access the funds at the safety deposit box.

He didn't even pay the fees to keep the box open. It is hard to believe that the $400,000 belonged to Danny when Danny didn't feel compelled to keep the box up to date. That's not how you would behave if the money was yours.

That's not the type of behavior that you would expect if someone had accepted hundreds of thousands of dollars as a gift. A more plausible scenario is that Danny knew that his dad had squirreled some money away, at best. Danny didn't act like the box contained *his* money.

The story from Jessica is even less compelling. She didn't know anything about a safety deposit box, let alone a huge stash of cash.

Overall, the children didn't behave like they had accepted delivery of a large quantity of cash. They acted like the safety deposit box wasn't theirs. And they behaved like they didn't know that the money belonged to them.

Third, the Court finds that Sullivan did not deliver the money.

To satisfy the delivery element, Sullivan must show that he "relinquished all present and future dominion and power over the subject matter of the gift." *Hall*, 562 N.E.2d at 649; *see also In re Marriage of Brill*, 87 N.E.3d 302, 313 (Ill. App. Ct. 2017). Delivery must be made "with the intention of vesting the title absolutely and irrevocably in the donee." *Simmons v. Simmons*, 409 N.E.2d 321, 324 (Ill. App. Ct. 1980) (citations omitted); *see also Shakman v. Dep't of Revenue*, 146 N.E.3d 640, 651 (Ill. App. Ct. 2019).

The government believes that Sullivan did not effectuate delivery. It points out that Defendant was the only signatory on the loan agreement for the box. *See* Govt.'s Renewed Mtn., at 5 (Dckt. No. 533). It also points out that both Sullivan and his son waited until Sullivan's release from prison so that Sullivan could access the box. *Id.*

Sullivan argues that he attempted to give his son both sets of keys to the box. *See* Def.'s Resp., at 3 (Dckt. No. 534). In his view, since he attempted to provide Danny with both sets of keys, he "totally delivered" the gift to Danny. *Id.*

The Court disagrees. The evidence in the record shows that Sullivan did not relinquish full control over the safety deposit box. And more importantly, he didn't relinquish control over its contents, either. He didn't surrender control of the $400,000.

For starters, when it comes to legal documentation, all roads lead to Sullivan as the box's owner. Sullivan was the only signatory on the box. *See* Safe Deposit Box Lease Agreement (Dckt. No. 533, at 8 of 57). His children were not co-applicants. *Id.* There's no paper trail suggesting that Sullivan transferred ownership to his kids.

Danny Sullivan's actions also suggest that he lacked control over the box. Danny learned that there was a problem with the box while his father was incarcerated. *See* Danny Sullivan Dep., at 39:14 – 40:10 (Dckt. No. 533). But rather than handle the issue himself, Danny waited for his father to deal with it after getting out of prison. *Id.* at 40:7 – 41:8.

Indeed, Sullivan spoke to the bank about the box after his release from prison. *See* Def. Sullivan Dep., at 29:22 – 30:14 (Dckt. No. 533). Before the bank learned about the government hold, it was going to follow the instructions of Defendant. *Id.*

Even post-incarceration, Defendant had power over the funds. *See Hall*, 562 N.E.2d at 649. He never relinquished full control over the money to his kids.

True, Sullivan gave Danny a key to the safety deposit box. But the key did not give Danny control and ownership of everything inside. A key is access. And access does not necessarily transfer ownership. Imagine if that rule applied when you swap keys with your next-door neighbor.

And in any event, if you're hiding over $400,000 in a secret safety deposit box, you might not want to be the only person holding a set of keys. It's $400,000 worth of belts and suspenders.

Sullivan believes that this case is like *Koerner v. Nielsen*, 8 N.E.3d 161 (Ill. App. Ct. 2014). That case involved the ownership of a dog. A couple lived together, but then broke up. The question was whether the ex-girlfriend owned the pooch. More specifically, the question was whether the ex-girlfriend gave the pet to her ex-boyfriend.

The ex-girlfriend argued that she continued to own the dog. She argued that she did not deliver the dog to her ex-boyfriend as a Christmas gift. *Id.* at 165. She pointed out that her name

7

was listed on the pooch's papers, and she was involved in the dog's care while living with her ex-boyfriend. *Id.*

The court in *Koerner* concluded that "the need for a physical delivery of the dog was obviated" by the fact that the couple lived together. *Id.* The couple and the pooch lived under the same roof. So, the court held that the girlfriend had gifted the dog to her boyfriend. *Id.*

Analogizing to *Koerner*, Defendant argues that he did "everything he could" to give his children dominion and control over the funds given the circumstances of his incarceration. *See* Def.'s Resp., at 4 (Dckt. No. 534).

The government disagrees that *Koerner* is on all fours. It argues that "[u]nlike the boyfriend in *Koerner*, defendant's children were never in possession of the funds, and delivery was required to make the claimed gift effective." *See* Govt.'s Reply, at 3 (Dckt. No. 535).

The government is correct. Danny and Jessica Sullivan never accessed the funds. *See* Def. Sullivan Dep., at 23:15 – 24:13 (Dckt. No. 533). Danny paid a rental fee, but only for a while. He didn't try to open the box. *Id.* at 38:11-12, 39:7-12. Danny didn't live with the money like the ex-girlfriend in *Koerner* lived with the dog.

Sullivan testified that Danny should have been able to access the box. But Sullivan did not testify that he showed Danny how to access the box or instructed him about how to do so. *See* Def. Sullivan Dep., at 22:6 – 22:14 (Dckt. No. 533). Sullivan did not testify that he attempted to update documentation with the bank to effectuate the gift, either. *See id.* The bank had no record that Danny owned anything inside. So, Sullivan did not do "everything he could" to relinquish control over the funds.

As the saying goes, possession is 90% of the law. The simple reality is that the children never had control over the box, or the funds. Danny had a key to the box at one point. But he never accessed the box, and never got his hands on the money. And Jessica didn't even know that the money was there.

## Conclusion

For these reasons, the government's renewed motion for a turnover order is hereby granted.

Date: July 22, 2024

Steven C. Seeger
United States District Judge

8